H. F. MILLER, APPELLEE, V. CHICAGO, BURLINGTON & QUINCY RAILWAY COMPANY, APPELLANT.

FILED NOVEMBER 19, 1909. No. 15,794.

1. Carriers: LIABILITY. "A common carrier of live stock cannot, by contract with a shipper, relieve itself, either in whole or in part, from liability for injury or loss resulting from its own negligence." *Chicago, R. I. & P. R. Co. v. Witty,* 32 Neb. 275.

2. ———: ———. The acts of congress examined and referred to in the opinion *held* not to in any manner supersede or amend the rule at common law with reference to the liability of a common carrier for its negligence in the transportation of property by interstate shipments.

APPEAL from the district court for Custer county: BRUNO O. HOSTETLER, JUDGE. *Affirmed.*

*James E. Kelby* and *Arthur R. Wells,* for appellant.

*Sullivan & Squires, contra.*

FAWCETT, J.

On September 18, 1906, plaintiff shipped two stallions from Cambria, Iowa, over defendant's railroad to Broken

Bow, Nebraska. While the animals were in transit, the bedding in the car in which they were loaded caught fire and one of the stallions died as a result of inhaling the flames and smoke from the fire. This action was brought to recover $2,000, the alleged value of the stallion. Defendant by its amended answer alleged that the shipment was interstate; that the rate of charge for the transportation of the animal depended upon and was proportioned to the value of said horse, which value was fixed and declared by plaintiff; that plaintiff was advised of the rate to be charged, and that a greater rate would be charged for a 'greater value; that plaintiff placed the value of $100 on said horse, upon which valuation the freight rate was assessed, and that by reason thereof plaintiff obtained the benefit of the lower rate determined by the value fixed by him, rather than the higher rate placed on a higher valuation according to the tariffs and classifications of defendant published and in force according to law at the time, whereby plaintiff is bound by said valuation, and in no event can he recover more than $100 for the loss of the horse. For reply to this amended answer, plaintiff set up the statute of the state of Iowa, which provided that no contract, rule or regulation should exempt any railroad corporation from its liability as a common carrier, and denied that he agreed to the valuation fixed upon the horse, or authorized any other person or agent to agree for him as to what the valuation of said horse was at the time of the shipment, and never agreed that the defendant was to be relieved from any liability which it might incur with reference to, or in connection with, said shipment. There was a trial to a jury, which resulted in a verdict for plaintiff for $1,315.50. Judgment was rendered upon the verdict, and defendant appeals.

Defendant in its brief states the real questions in controversy thus: "The defendant requested the trial court to give a series of instructions numbered 2, 3 and 4, to the effect that the plaintiff was bound by the provisions of the tariffs under which the rate of charge for transporting

the animals had been fixed, and could recover not to exceed $100 and interest from the date of shipment. The court refused the instructions asked by defendant, and gave to the jury instructions 9, 10 and 11, wherein he told the jury that the defendant was subject to all the liabilities of a common carrier of said horse; that a contract between the shipper and the carrier, which limits the liability of the carrier or relieves it entirely or partially from damages for the loss of such stock, is void and of no effect, and that the defendant must answer for the full value of the animal. * * * The rulings on these instructions severally were assigned as grounds of the motion for a new trial, which was overruled, and errors assigned thereon. It is to secure a review of these errors that this appeal is prosecuted. * * * . Stated in its simplest terms, the question is whether the liability of the defendant for the loss of the horse is governed by the laws of Nebraska or by the laws of the United States with reference to which and in compliance with which the tariffs of the carrier had been published and filed."

The contract relied upon by defendant contains a provision to the effect that the shipper had been offered by the railroad company alternative rates proportioned to the value of said animal, said value being fixed and declared by the shipper or his agent, and that the shipper, in order to avail himself of said alternative rates and to secure the benefits thereof, declared the value of each of the said animals to be $100. The rate charged for the transportation of the animal was the rate fixed by the tariffs based upon the value declared in the contract of $100 a head. The record fairly sustains plaintiff's resume of the evidence as contained in his brief, viz.: That while the horses were en route, near the town of Hastings, in the state of Iowa, while the train was pulling up a steep grade, a fire originated in the car in which the horse was placed, caused probably by the sparks from the engine. As a result of the fire, the horse in controversy was burned and injured so that he died in the car somewhere between

Lincoln and Broken Bow, in the state of Nebraska. The occupants of an adjoining freight car discovered the fire and notified the engineer and train crew of that fact. The engineer and train crew made no immediate effort to extinguish the fire, but continued to run the train, while the car was burning, until they reached the top of the grade. Those who discovered the fire carried water from some barrels in a box car, and later from the engine tender, while the train was still running, and tried to extinguish the fire, but were unable to do so. With full knowledge of the burning car, the engineer refused to stop his train until as above indicated. That plaintiff did not personally load and bill the horse, nor was he present when the same was done. That his brother, Luther Miller, had this done. That Luther Miller did not personally superintend the loading or procure the bill of lading, but had one L. O. Nelson, an employee, do so. Nelson was not expressly authorized to waive any of plaintiff's rights, to fix any rates for shipment of the horse, or to agree to any value of the horse less than its true value. There was no conversation between Nelson and the company's agent as to the rate charged for shipment, the value of the horse, or of the conditions of the contract of shipment. After loading the horse upon the car, Nelson hurriedly went into the depot and procured the bill of lading. That the agent of the company had inserted in the contract of shipment as the value of the horse the sum of $100, and by the terms of the contract to which Nelson signed the name of Luther Miller, and not the name of the plaintiff, the company's liability in connection with the shipment and the loss or injury to the horse was limited to the sum of $100. No freight was paid for the horses at the initial point of shipment, but freight was paid at the point of destination for the live horse, which was shipped with the horse involved in this case. The contract upon which defendant relies is substantially set out in defendant's amended answer.

The law in force in the state of Iowa at the time the

shipment was made (code, sec. 2074) was as follows: "No contract, receipt, rule or regulation shall exempt any railway corporation engaged in transporting persons or property from the liability of a common carrier, or carrier of passengers, which would exist had no contract, receipt, rule or regulation been made or entered into." Section 4, art. XI of the constitution of Nebraska, is as follows: "The liability of railroad corporations as common carriers shall never be limited." If the law governing this shipment is to be found in the sections of the Iowa statute and Nebraska constitution above quoted, defendant's appeal is clearly without merit. But defendant insists that it is not bound by these sections, for the reason that the powers of congress over interstate commerce are plenary, and that legislation by congress supersedes any state laws which may have been theretofore in force; that the acts of congress regulating interstate commerce constitute a comprehensive body of law for the regulation of that commerce and of the rights and duties of those who engage therein; that the rights of the shipper and the duties of the carrier as to rates charged and service furnished and liabilities incurred in interstate commerce are fixed and determined by the tariffs which are published and filed by the carrier with the interstate commerce commission in pursuance to acts of congress; that to compel the defendant to pay the judgment rendered in this case would be to force it to violate the federal statutes regulating interstate commerce; that the reasonableness of the rate charged or the regulation of the tariffs as to the liability assumed by the carrier cannot be inquired into in this proceeding. In support of its contention, the defendant calls attention to the act of congress to regulate commerce, approved February 4, 1887 (24 U. S. St. at Large, ch. 104, p. 379), the amendatory acts approved March 2, 1889 (25 U. S. St. at Large, ch. 382, p. 855), February 10, 1891 (26 U. S. St. at Large, ch. 128, p. 743), and February 8, 1895 (28 U. S. St. at Large, ch. 61, p. 643), the Elkins act, approved February 19, 1903, and the

Hepburn act, approved June 29, 1906, amending both the original interstate act and the Elkins act. Defendant quotes from the amended section 6 of the interstate commerce act as follows: "That every common carrier subject to the provisions of this act shall file with the commission created by this act and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation. * * * The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the commission may require, all privileges or facilities granted or allowed and any rules or regulations which in anywise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee. * * * No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this act; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs." 34 U. S. St. at Large, pt. 1, ch. 3591, p. 586.

Defendant also quotes from the Elkins act as amended by the Hepburn act, as follows: "The wilful failure upon

the part of any carrier subject to said acts to file and publish the tariffs or rates and charges as required by said acts or strictly to observe such tariffs until changed according to law, shall be a misdemeanor; * * * and it shall be unlawful for any person, persons, or corporation to offer, grant, or give or to solicit, accept, or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereof whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereof, or whereby any other advantage is given or discrimination is practiced. * * * Whenever any carrier files with the interstate commerce commission or publishes a particular rate under the provisions of the act to regulate commerce or acts amendatory thereto, or participates in any rates so filed or published, that rate as against such carrier, its officers, or agents in any prosecution begun under this act shall be conclusively deemed to be the legal rate, and any departure from such rate, or any offer to depart therefrom, shall be deemed to be an offense under this section of this act." 34 U. S. St. at Large, pt. 1, ch. 3591, p. 587.

Counsel for defendant also quote from and place great reliance upon *Armour Co. v. United States*, 209 U. S. 56, and *Hart v. Pennsylvania R. Co.*, 112 U. S. 331. *Hart v. Pennsylvania R. Co.* was a very similar case indeed to the one at bar; and, if it were to be accepted as authority in this state, it would be conclusive of the defendant's right to a reversal of the judgment complained of. But that case has been previously cited to this court in numerous other cases, among which are: *Chicago, R. I. & P. R. Co. v. Witty*, 32 Neb. 275; *Atchison, T. & S. F. R. Co. v. Lawler*, 40 Neb. 356; *Chicago, B. & Q. R. Co. v. Gardiner*, 51 Neb. 70; *Pennsylvania Co. v. Kennard Glass*

& *Paint Co.,* 59 Neb. 435. In all of these cases this court disregarded *Hart v. Pennsylvania R. Co.,* and adhered to the rule announced in *Chicago, R. I. & P. R. Co. v. Witty, supra,* that "a common carrier of live stock cannot, by contract with a shipper, relieve itself, either in whole or in part, from liability for injury or loss resulting from its own negligence." In that case, speaking through Mr. Justice NORVAL, we said: "The recovery in this case is placed solely upon the ground of the negligence of the plaintiff in error in handling of its cars. As the stipulation in the contract, under which the horse in question was shipped, relieved the carrier from all liability for damages, excepting those which should result from its own gross negligence, such provision is contrary to sound public policy, and is therefore void. It is claimed that the limitation in the contract, as to the amount of damages in case of loss or injury, does not tend to exempt the carrier from liability for negligence. The authorities cited in brief of plaintiff in error (among which was *Hart v. Pennsylvania R. Co., supra*) so hold; but we are unable to draw such a distinction. If a carrier cannot, by stipulation, be relieved from liability for its negligence, it is equally clear, for the same reason, that it cannot, by contract with the shipper, limit the amount of damages resulting from such negligence. If the plaintiff in error can lawfully stipulate that the damages shall not exceed $100, it could likewise contract that it should not be more than $25, or any smaller sum, thereby practically relieving itself from all responsibility for injuries occasioned by its own negligence. That would be accomplishing indirectly what it could not lawfully do directly."

Even if we did not feel bound by our former holdings as above set forth, we think that defendant must fail in its contention that the acts of congress relied upon have in any manner superseded or modified the rule at common law, or the right of a state to determine the liability

33

of a common carrier for its negligence in the transportation of property by even interstate shipments. Section 7 of the Hepburn act amends section 20 of the interstate commerce act. Paragraph 11 of section 20, as fixed by this amendment, provides: "That any common carrier, railroad, or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liabilities hereby imposed: *Provided,* that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law." 34 U. S. St. at Large, pt. 1, ch. 3591, p. 595.

There is much force in plaintiff's contention that this amendment was "designed to destroy the precedent that might have arisen by virtue of the *Hart* case." Certain it is that no case, since the adoption of that amendment, has been cited sustaining that case. In attempting to distinguish the cases of *Chicago, M. & St. P. R. Co. v. Solan,* 169 U. S. 133, *Pennsylvania R. Co. v. Hughes,* 191 U. S. 477, and *Martin v. Pittsburg & L. E. R. Co.,* 203 U. S. 284, counsel for defendant concede that, "prior to the passage of the amendments to the interstate commerce laws which are known as the Elkins act, which became effective February 19, 1903, and the Hepburn act, which was approved June 29, 1906, and became effective August 28, 1906, it was held that the state statutes forbidding contracts limiting liability were valid and enforceable as applied to interstate shipments." This concession by defendant repudiates *Hart v. Pennsylvania R. Co.,* *supra,* as an authority. That case having been decided

November 24, 1884, long before the passage of any of the acts of congress relied upon, and being at variance with the later cases above cited, which admittedly establish the rule existing at and prior to the passage of those acts, it is eliminated as an authority upon the question under consideration. This leaves, as the only point for determination, defendant's contention, that the acts of congress referred to have superseded the statute of Iowa and constitution of Nebraska, and that the liability of defendant is fixed and to be determined by the tariffs which had been published and filed by defendant with the interstate commerce commission pursuant to said acts of congress. In holding, as we do, that this contention must fail, it is not necessary to consider the power of the congress to supersede the constitution and laws of a state. It is sufficient to say that we do not think the acts of congress referred to were designed to have such effect. That the constitutional inhibition against limiting its liability, by a railroad company, as was attempted to be done in the case at bar, is not only just, but in harmony with a sound public policy, is settled law in this jurisdiction. *Chicago, R. I. & P. R. Co. v. Witty,* 32 Neb. 275; *Atchison, T. & S. F. R. Co. v. Lawler,* 40 Neb. 356; *Chicago, B. & Q. R. Co. v. Gardiner,* 51 Neb. 70; *Pennsylvania Co. v. Kennard Glass & Paint Co.,* 59 Neb. 435.

The contention that plaintiff is estopped by the valuation stated in the contract of shipment cannot be sustained. Such a limitation is prohibited by both the statute of the state in which the shipment originated and the constitution of the state in which delivery was to be made, and is therefore void. If the rate agreed to be paid for the shipment under such void contract were not the correct rate, it did not bind either party, and would not have done so had it been paid in advance. If too low, the agent at the point of delivery could have demanded the shortage. If too high, the shipper could have demanded a return of the excess. Moreover, if the value fixed in the contract is binding upon a shipper, it is equally so upon

the carrier, and, under the doctrine of estoppel contended
for, the shipper could fix the value of a very inferior ani-
mal at a ridiculously high amount and, in case of loss,
collect from the carrier such fictitious value. The old
adage, "It is a poor rule that does not work both ways,"
would seem to be apropos.

The negligence of defendant and amount of plaintiff's
damage having been fully established, the judgment of
the district court is

                                        AFFIRMED.